UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

WARDELL COWARD, III,

                Plaintiff,

v.                                        ACTION NO. 2:18cv302

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Wardell Coward, III, brought this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") selecting Coward's ex-spouse to serve as representative payee for benefits payable to one of their minor children.

An order of reference assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Wardell's motion for summary judgment (ECF No. 10) be **DENIED** and that the Commissioner's motion for summary judgment (ECF No. 11) be **GRANTED**.

## I. PROCEDURAL BACKGROUND

On August 27, 2015, the SSA awarded Title II disability insurance benefits to plaintiff, Wardell Coward, III ("Coward").[1] R. 45–60. At the time of the award, Coward was divorced from his ex-spouse, Saundra Coward, also known as Saundra Hattrick[2] ("Hattrick" or ex-spouse), with whom he previously had two children, a son, T.C., and a daughter, B.C. R. 39, 113–15, 249. Each minor child also began receiving a monthly child's benefit from SSA, based upon Coward's disability and earnings record, after Coward applied for benefits on their behalf. R. 71–81, 87–92, 96–99, 250; *see* 20 C.F.R. § 404.350(a) (providing for "child's benefits on the earnings record of an insured who is entitled to . . . disability benefits"). SSA selected the following representative payees: Coward for T.C. and Hattrick for B.C. R. 87–92, 250–51.

On April 25, 2016, Coward requested that the SSA reconsider its decision regarding B.C.'s payee, claiming that he should have been selected. R. 103. On May 11, 2016, the SSA reviewed the matter and confirmed its prior selection of Hattrick. R. 106–08.

Coward sought further review before an Administrative Law Judge ("ALJ"). ALJ Irving Pianin heard the matter and received testimony from Coward, Hattrick, and David McDonald (a divorce mediator who assisted with Coward's divorce) on February 28, 2017. R. 109–12, 131, 247–302. On April 25, 2017, ALJ Pianin affirmed the decision appointing Hattrick as B.C.'s representative payee. R. 39–43. On April 23, 2018, the Appeals Council denied Coward's request for review of the ALJ's decision. R. 4–7. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. § 405(h); 20 C.F.R. § 404.981.

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[2] The hearing transcript spells the ex-spouse's name as "Sondra Hatrick." R. 247. The Court uses the spelling in SSA correspondence and in the ALJ's opinion. *See, e.g.,* R. 238.

Having exhausted his administrative remedies, Coward filed a complaint with this Court on June 29, 2018.[3] ECF No. 4. The Commissioner answered on September 7, 2018. ECF No. 6. In response to the Court's order, Coward and the Commissioner filed motions for summary judgment, with supporting memoranda and/or exhibits, on October 22 and November 21, 2018, respectively. ECF Nos. 10–12. On December 11, 2018, Coward filed an untimely reply, that was docketed as subject to defect.[4] ECF No. 14. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II. RELEVANT FACTUAL BACKGROUND

### A.  *Coward and Hattrick's 2010 divorce decree and 2009 memorandum of agreement*

On May 18, 2010, the Circuit Court for the City of Virginia Beach entered a final decree granting Coward a divorce from his spouse. R. 113–15. This decree provided for "joint legal and joint physical custody of the minor children," R. 114, and incorporated an August 4, 2009 memorandum of agreement entered into by the parties to the divorce, R. 116–30.

In the memorandum of agreement, Coward and Hattrick agreed upon terms "settling all property and other rights and obligations arising out of the marital relationship . . . ." R. 116. The signed agreement provides, in pertinent part:

> 5.  **Personal Property**: The parties' personal property has already been divided by the parties.
>
> Wardell shall retain the home at . . . Whisper Walk, Chesapeake, Virginia. He shall be entitled to all equity in this home.

---

[3] The Court initially received Coward's motion to proceed *in forma pauperis*, along with a copy of the proposed complaint, on June 5, 2018. ECF No. 1. Following the Court's denial of that motion on June 13, 2018, Coward paid the filing fee and the complaint was docketed. ECF Nos. 2–4.

[4] In the absence of any objection by the Commissioner, by separate order filed contemporaneously with this report and recommendation, the Court directs that the filing defect be removed and accepts the filing of the exhibits submitted by the *pro se* plaintiff.

3

Saundra shall retain the homes in Pensacola and Middleburg, Florida. She shall be entitled to all equity in these homes.

. . . .

Wardell and Saundra shall retain their military retirements.

. . . .

7. **Child Custody and Visitation**: . . .

    a.    Wardell and Saundra shall have joint legal custody of the minor children of the parties. Joint legal custody means that both parents retain joint responsibility for the care and control of each minor child of the marriage even though the parties are living separate and apart, and that they retain joint authority to make decisions concerning each child even though the child's primary residence may be with only one parent.

. . . .

    b.    Wardell and Saundra shall share physical custody of the children. Wardell will have primary physical custody of [T.C.] and Saundra will have primary physical custody of [B.C.]. Saundra and Wardell agree to a parenting plan which maximizes the time each parent may spend with the children. Their current agreement is to exchange the children every four days. Otherwise they agree to have a flexible parenting schedule to accommodate their schedules as well as the children's.

. . . .

8. **Child – Spousal Support**: By agreement, and due to their equal parenting plan, neither parent demands child support from the other.

. . . .

9. **Medical Insurance**: Wardell and Saundra agree to continue to provide hospitalization and major medical benefits (Tricare), including dental coverage through his/her employment and to maintain said coverage for the benefit of the children until such time as they are no longer eligible for coverage. All medical expenses for the children not paid by medical insurance shall be shared by Wardell and Saundra equally.

10. **Children's Education**: Wardell and Saundra shall equally cover the extra-curricular costs for the children through mutual agreement. Saundra shall cover the costs of childcare and after-school care costs.

Wardell shall fund the 529 College Funds for both children to attend college for four years.

11.  **Spousal Support**: Neither party demands spousal support from the other.

12.  **Taxes**[:] The parties agree to consult with a tax expert to maximize their refund. It is their intention to file "married" for 2009 and equally share in the refund. When the parties file separately Saundra shall claim [B.C.] and Wardell shall claim [T.C.].

13.  **Equitable Distribution**: Both parties shall waive any rights of any other property except as provided herein, including, all retirement, pension and 401K accounts of the other.

. . . .

29.  **Entire Agreement**: This Agreement contains their entire understanding, th[ere] being no representations, promises, warranties, covenants or undertakings ("side-agreements") other than those expressly set forth herein. The parties hereby cancel, annul, and invalidate [any] and all prior property settlements by them at any time heretofore made, whether oral and/or in writing. All modifications of this Agreement shall be of no effect unless expressed in writing and signed by both parties.

R. 118–23, 129–30.

*B.     Hearing Testimony on February 28, 2017*

    1.    **Testimony of Wardell Coward**

At the hearing before ALJ Pianin, Coward testified that he is disabled due to back, knee, and neck issues. R. 253. He stated that he desires to be the sole representative payee for B.C. and has no interest in any co-payee arrangement. R. 261. Coward advised that he equally shares actual custody of B.C. with his ex-spouse. R. 257–58. Because the parents trade physical custody of both children every four days, Coward testified he could not understand how the SSA previously found that B.C. lived with Hattrick.[5] R. 257–59. Further, as the applicant for the payment of

---

[5] In so testifying, Coward apparently referred to a May 11, 2016 letter he received from the SSA. The letter denied Coward's request to reconsider the appointment of Hattrick as representative payee and justified the decision based upon the SSA's "payee preference list" and the fact that

5

benefits to the children, Coward claimed that he should have been selected as the representative payee for each child. R. 266–67.

While acknowledging the plain language of paragraph 7(b) of the memorandum of agreement and his signature on that document, Coward disputed that Hattrick had primary physical custody of B.C. R. 253–55. Coward asserted that the language of paragraph 7(b), identifying the parent with "primary physical custody" of each child, should be read in conjuction with paragraph 12's language concerning taxes. R. 255–56. Coward testified:

> What I'm saying is they interpreted it different. Even though it said that S[au]ndra has primary custody, it says that only because of [paragraph] 12 because S[au]ndra had – one of us had to file for taxes for the – you know, we can't both file for both kids so that's the reason why 12 was in there stating to include regarding 7[b]. Basically saying you got primary custody but only for tax purposes only. That's the reason why they said we have joint physical and legal custody.

R. 256.

Finally, Coward expressed concerns about Hattrick's suitability to serve as a payee for B.C. R. 267–68. As grounds, Coward asserted, that: (1) Hattrick violated an alleged verbal agreement, to retain the Florida houses and to deed one to each child at age 18, by selling one of the homes and using the proceeds to buy her new husband a home in Alaska; and (2) Hattrick engaged in "sneaky stuff" by proposing to give up her status as representative payee for B.C., if Coward would agree to be solely responsible for B.C.'s medical, dental, orthodontia, school lunches, and other expenses. R. 17, 267–71.

---

"[B.C.] is living with Saundra Hattrick." R. 106.

### 2. Testimony of David McDonald

David McDonald, president of the Mediation Center of Hampton Roads, testified that he assisted Coward and Hattrick with preparing the 2009 memorandum of agreement. R. 274–75. McDonald testified that paragraph 7(b) of the agreement was supplied by the Cowards and was not boilerplate language. R. 275, 277–78. He claimed that the language concerning primary physical custody was included at the Cowards' request "to reflect on how the claiming of the children would go as far as taxes." R. 277. When asked why this language was used in the parenting portion of the agreement rather than the tax paragraph, McDonald first stated that he could not recall and then stated that he did not know. R. 278. McDonald also testified that, when meeting with Coward and Hattrick, neither claimed the other was unfit to serve as a parent, caretaker, or financial guardian, and that nothing about his dealings with them led him to believe one was more financially responsible than the other. R. 279.

### 3. Testimony of Saundra Hattrick

Hattrick agreed that the memorandum of agreement was incorporated into her divorce decree and provided for joint legal and physical custody of the couple's children. R. 283–84. She testified, however, that Coward effectively imposed the agreement's terms upon her, by threatening to prevent her extrication from the marriage and to make life difficult, if she sought the advice of counsel. R. 285–86; *but see* R. 126 (stating "[t]he parties acknowledge that they are entering into this Agreement of their own accord and without coercion or pressure of any kind . . . [and] have been advised of their rights to obtain counsel and have waived it").

Hattrick testified that, apparently after Coward applied for benefits for the children, he told her that an SSA representative would be contacting her and he wanted her to state that she agreed Coward could serve as representative payee. R. 288. After speaking with the SSA representative

7

and thinking about the matter, Hattrick advised Coward that she would agree he could serve as B.C.'s representative payee, if Coward signed a "document stating [he would] be paying for school lunches, dentists, orthodontists and what not." R. 289. When Coward refused, Hattrick apparently declined to withdraw from consideration as B.C.'s payee. *Id.*

Hattrick denied that B.C. spent approximately 50 percent of her time with each parent. R. 286. While conceding that was true for the two most recent years, Hattrick indicated that from 2009 to early 2015, B.C. stayed with her approximately 70–80 percent of the time. *Id.* Hattrick stated that Coward had not discussed with her any claims about misuse of B.C.'s benefits. R. 287. She also testified that she files an annual report with the SSA accounting for the use of B.C.'s benefits and has received no indications of any problems from the agency. *Id.*

When asked if she and Coward equally shared child-rearing expenses, Hattrick claimed that she paid much more than Coward. R. 287–88. Hattrick also denied the existence of any agreement to give one or both of her Florida homes to the children at the age of 18. R. 289–90.

### III. THE ALJ's DECISION

After reviewing the SSA's regulations and policies for selecting representative payees and the pertinent hearing testimony, the ALJ found that Coward failed to establish that the selection of Hattrick as B.C.'s representative payee was incorrect or otherwise inappropriate. R. 40–43. The ALJ predicated his conclusion on the following points. First, he found both parties to be "essentially credible" and acceptable representative payees. R. 42. Second, the ALJ found that the SSA made proper use of its representative payee preference list. *Id.* In this regard, he implicitly determined that, notwithstanding Coward and Hattrick's shared custody of B.C., the selection of the latter was supported by the fact "that until only recently [Hattrick] actually had physical custody of [B.C.] more than Mr. Coward." *Id.* Third, while disclaiming authority to "re-write,

8

amend, or resolve a dispute over" the memorandum of agreement and noting the parties' ongoing efforts to revisit the terms of their divorce in local court, the ALJ noted that the plain language of the agreement "award[ed] Ms. Hattrick primary physical custody" of B.C. and declined "to interpret it otherwise . . . ." R. 42–43. Fourth, the ALJ found that ongoing animus between Coward and Hattrick counseled against appointing them as co-representative payees for B.C. R. 43. Fifth, and notwithstanding such animus, the ALJ found no need to select an independent, third-party representative payee. *Id.* Finally, the ALJ found that neither Coward nor Hattrick had proven that the other was incapable of serving as representative payee. *Id.*

## IV. **STANDARD OF REVIEW**

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "It consists of more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an "improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514,

517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the ALJ's decision is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V. ANALYSIS

***The ALJ's decision to uphold Hattrick's selection as the representative payee for B.C. is lawful and supported by substantial evidence.***

### A.  The rules and factors governing the selection of a representative payee

The minor child of an individual receiving disability benefits from the SSA is entitled to "child's benefits" based upon the insured's earnings record. 20 C.F.R. § 404.350(a). To be eligible, the child must have applied for benefits, be the child of and dependent upon the insured, be unmarried, and under age 18. *Id.* at § 404.350(a)(1)–(5). Once approved, and if the child is less than 18 years old, the SSA typically "pay[s] benefits to a representative payee." 20 C.F.R. § 404.2010(b).

To guide its selection of such a payee, the SSA established "categories of preferred payees" that it identified as being "flexible" and guided by the "primary concern . . . to select the payee who will best serve the beneficiary's interest." 20 C.F.R. § 404.2021. Inasmuch as this case concerns a minor child in the custody of her two natural parents, the only pertinent category is the SSA's first identified preference, that is, "[a] natural . . . parent who has custody of the beneficiary . . . ." *Id.* at § 404.2021(c)(1).

In making a payee selection, the SSA's operations manual for processing claims identifies a non-exclusive set of factors for consideration. These factors include whether the person: (1) "show[s] concern for the beneficiary's well[-]being"; (2) "appear[s] able to handle his/her own affairs"; (3) is "knowledgeable about the beneficiary's current and foreseeable needs"; (4)

"appear[s] to have the beneficiary's best interests at heart and seem[s] able to exercise good judgment"; (5) has "custody of . . . the beneficiary"; (6) has a family relationship with the beneficiary; and (7) is otherwise disqualified due to any felony convictions or proven misuse of funds. SSA Program Operations Manual System ("POMS") GN 00502.130.B.1; *see also* POMS GN 00502.105.A (identifying policy to choose best payee by considering all factors, including "relationship to the beneficiary," "interest in the beneficiary's well[-]being," and "custody of the beneficiary"). If two potential payees seem equally qualified, the operations manual directs consideration of a person's history, if any, of "good service," his/her "eager[ness] to serve," and a beneficiary's preference, if any, for a particular payee. POMS GN 00502.130.B.2.

Grounds for terminating the payment of benefits to a representative payee are: (1) a finding by the SSA or a court of misuse of benefits; (2) failure to use benefits on behalf of a beneficiary; (3) failure to perform a payee's duties; (4) a payee's death; (5) a payee's desire to withdraw from service; (6) a payee's inability to manage the beneficiary's payments; and (7) a payee's failure to cooperate with the SSA's requests for information or accountings. 20 C.F.R. § 404.2050(a)–(g).

### B.   Coward's grounds for attacking the ALJ's decision

Against this backdrop, Coward attacks the ALJ's decision on multiple grounds. First, he asserts that "[p]er a signed court order because both children live with me during the school week I was named as primary custodial parent." Pl.'s Mot. for Summ. J., ECF No. 10 at 1; *see also* ECF No. 10 at 4 (stating that a final court order "[n]am[ed] me . . . [p]rimary custodial parent for both [B.C.] and [T.C.]"). With respect to B.C., however, this assertion finds no support in the record. As recognized by the ALJ, R. 42, the circuit court's final decree of divorce provides for "joint legal and joint physical custody of the minor children . . . ." R. 114. Similarly, and as discussed below, the memorandum of agreement incorporated into the divorce decree also nowhere

11

designates Coward as the primary custodial parent of B.C. R. 119–20.

Second, Coward contends that the SSA's selection of Hattrick as B.C.'s representative payee rests upon a "misinterpretation of the divorce decree, which only allows Ms. Hattrick to claim . . . [B.C.] for tax purposes only . . . ." ECF No. 10 at 1. Relying upon the plain language of the decree, and the incorporated memorandum of agreement, the ALJ found that Hattrick had been awarded "primary physical custody" of B.C. R. 43.

The ALJ's conclusion in this regard is consistent with rules of contract interpretation, which look to the terms agreed upon by the parties, without adding terms they did not include. *See Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984). When a contract's terms are clear and unambiguous, a court must construe it in accord with its plain meaning. *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va. 1995). Thus, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D.C. McClain, Inc. v. Arlington County*, 452 S.E.2d 659, 662 (Va. 1995).

In the paragraph entitled "**Child Custody and Visitation**" of the memorandum of agreement incorporated into the divorce decree, Coward and Hattrick agreed to "share physical custody of the children." R. 119–20. Consistent therewith, they further agreed "to exchange the children every four days." R. 120. Notwithstanding this, they also agreed to designate each parent as having "primary physical custody" of one of the two children. *Id.* Pertinent to this matter, they agreed to designate Hattrick as "hav[ing] primary physical custody of [B.C.]." *Id.*

Relying upon the language of the "**Taxes**" paragraph in the same agreement, Coward seeks to amend the custody paragraph with the proviso that the designation of "primary physical

12

custody" **is for tax purposes only**. ECF No. 10 at 1–2 (emphasis added); *see* R. 120, 122. The tax paragraph of the agreement, however, already addresses the allocation of the children for tax purposes. It provides that "[w]hen the parties file separately Saundra shall claim [B.C.] and Wardell shall claim [T.C.]." R. 122. Thus, Coward seeks to interpret the agreement in a way that adds terms to the child custody paragraph that are already addressed elsewhere in the agreement. Such an interpretation would mostly render the tax paragraph superfluous. It would also rewrite and narrow the plain language of the custody subparagraph (¶ 7b), which addresses matters of "physical custody" rather than taxes and finances. R. 120. Indeed, other than addressing the need for the parties to update their wills, none of the numerous subparagraphs (¶ 7a – h) of the child custody and visitation portion of the memorandum of agreement addresses matters pertaining to taxes and finances. R. 119–21. To the contrary, such matters are addressed elsewhere in the agreement, including in paragraphs 4–6, 8–13, and 17 of that agreement. R. 118–19, 121–25.

Further, Coward's reliance upon the testimony of mediator David McDonald to support his interpretation of the parties' contract is barred by the parol evidence rule because such testimony also seeks to constrict the written terms of the parties' agreement. *See Amos v. Coffey*, 320 S.E.2d 335, 337 (Va. 1984) (holding "parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument") (citation and quotation marks omitted); *see also Centex Constr. v. Acstar Ins. Co.*, 448 F. Supp. 2d 697, 712 (E.D. Va. 2006). For these reasons, the Court finds no legal error in the ALJ's interpretation of the divorce decree and the memorandum of agreement.[6]

---

[6] Alternatively, even if the Court accepted Coward's interpretation of the memorandum of agreement, for the reasons discussed below and because the ALJ's decision is supported by substantial evidence and not contrary to law, the result here would be the same.

13

Third, Coward argues that the ALJ erred in upholding Hattrick's selection as payee because Hattrick falsely testified "that [B.C.] lives with her 80% of the time . . . ." ECF No. 10 at 5. Having seen and heard from the witnesses, the ALJ found that both Hattrick and Coward were "essentially credible." R. 42. Contrary to Coward's assertion, the ALJ reported that Hattrick testified that she and Coward had exchanged the children every four days "for the last 2 years but that previously she had [B.C.] 70–80% of the time." *Id*; *see also id.* (concluding that "though the parties share custody, the testimony of Ms. Hattrick indicated that until only recently she actually had physical custody of the children more than Mr. Coward").[7] Upon review, the Court finds that the ALJ accurately paraphrased Hattrick's testimony. *See* R. 286.

Moreover, to the extent that Coward challenges the ALJ's credibility determination, the Court's task is to determine whether substantial evidence supports the ALJ's decision, not to substitute its judgment on matters of credibility for that of the ALJ who actually saw and heard the witness testimony. *See Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). In the absence of good reason for doing so, the Court declines to overturn the ALJ's credibility determinations.

Fourth, on a related note, Coward asserts that, in proposing to accede to his selection as B.C.'s payee in exchange for his assumption of full responsibility for certain of B.C.'s expenses, Hattrick attempted to "blackmail" him and use the SSA in furtherance thereof. ECF No. 10 at 2;

---

[7] In this respect, if the SSA's prior statement, at the reconsideration stage, that "[B.C.] is living with . . . Hattrick," R. 106, is construed to mean that B.C. did not live with Coward, the ALJ necessarily rejected such a conclusion. *See also* R. 265 (noting "[t]hat was probably poorly worded").

14

*see also* ECF No. 10-1. "Blackmail" is defined as "[t]he crime of making one or more threatening demands without justification; the offense of coercing someone by threats of public exposure or criminal prosecution . . . ." *Black's Law Dictionary* (10th ed. 2014). Although Hattrick apparently sought to revise the terms of the parties' divorce, her proposal to Coward involved neither the use of unjustified extortionate demands nor attempted improper coercion. *See* ECF No. 10-1. No blackmail occurred. Instead, Hattrick merely made a proposal that Coward was free to accept or reject.[8]

Fifth, Coward argues that the ALJ erred in upholding Hattrick's selection because Coward's children's benefits are derivative of his own disability benefits and he has faithfully discharged his responsibilities to provide for his children for the last 12 years. ECF No. 10 at 2; *see also* R. 261–62. Taking the latter point first, and in response to Coward's testimony that he felt stigmatized as a "deadbeat dad" by the SSA's failure to select him as B.C.'s payee, R. 261–62, 266–67, the ALJ expressly noted that Coward was an acceptable representative payee and found no grounds for disqualifying him from such service. R. 42 (noting "[t]he undersigned does not find Mr. Coward an unacceptable representative payee, as he feels has been said of him").

As to the former point, Coward operates from the mistaken assumption that the fact of his disability gives him a leg up in serving as a representative payee. R. 261–62. Whether

---

[8] Similarly, Coward also suggests that Hattrick only decided to pursue status as a payee to spite Coward for allegedly having rejected her attempt to relocate their children to Alaska so that she could be with her fiancé. ECF No. 10 at 5. Coward offers no explanation for why he failed to testify about such matters to the ALJ or include such information in the record before the SSA. Such information is, however, of a piece with other evidence causing the ALJ to conclude that "animus" exists between Coward and Hattrick. R. 43. Therefore, although new, this evidence is not material, and will not be considered by the Court and does not warrant a remand. *See* 42 U.S.C. § 405(g) (a "court . . . may order additional evidence to be taken before the Commissioner . . . , but only upon a showing" the evidence is new, material, and "good cause" exists for the failure to previously submit such evidence).

characterized as a property right or vested interest, the claim to such status (or the underlying benefits) finds no support in the statute or regulations giving rise to a child's benefit. *See* 42 U.S.C. §§ 402(d)(1) (providing for payment of "child's insurance benefits"), 405(j)(1)(A) (authorizing payment of benefits to a representative payee for the "use and benefit" of the beneficiary); 20 C.F.R. § 404.2021 (listing categories of preferred payees and stating that selection primarily turns upon who "will best serve the beneficiary's interest"). This is so because the beneficiary is the child, rather than the disabled adult parent or the representative payee.[9]

The factors specified by the SSA for use in selecting a representative payee also give no consideration to whether the proposed payee is the adult whose disability gives rise to a child's claim for benefits. *See* POMS GN 00502.130.B.1. Instead, the factors identified look to the proposed payee's custody of, relationship to, and concern for the beneficiary and beneficiary's interests, the payee's judgment, his financial responsibility, and the existence of any disqualifying factors. *Id.*

As Hattrick's familial relationship to B.C. was uncontested, during the hearing the ALJ sought information about the extent and nature of her custody of B.C., her financial responsibility, the financial support she provided to B.C., the financial support provided by Coward for B.C., and any facts that would disqualify Hattrick from service. R. 256–58, 261–65, 267–71, 276–81, 283, 285–90, 292–93, 295–97. Having done so, the ALJ concluded that Hattrick was "essentially credible" in describing her relationship with B.C., her financial and other support provided to B.C.,

---

[9] For this reason, the Court rejects Coward's related suggestion that Hattrick's waiver, in the memorandum of agreement, of any right to child or spousal support and to Coward's "other property . . . including, all retirement, pension, and 401K accounts," R. 121–23, precludes her selection as a representative payee or her receipt as payee of B.C.'s benefits. ECF No. 10 at 4–5. The financial settlements stemming from a divorce are wholly separate from and have nothing to do with the government's payments of benefits to the child of a disabled adult parent. *See* R. 280–81.

16

and the extent of her custodial relationship with B.C. R. 42. On this latter point, the ALJ expressly credited Hattrick's testimony and concluded "that until only recently [Hattrick] actually had physical custody of [B.C.] more than Mr. Coward." *Id.* Notwithstanding the parties' antagonism and Coward's complaints about Hattrick, the ALJ also found no information disqualifying Hattrick from service as a payee. R. 42–43. Based upon the foregoing, the ALJ found that Hattrick qualified as an acceptable representative payee and that her selection was consistent with SSA policies and not "otherwise inappropriate." R. 43. Accordingly, the ALJ properly concluded that Coward failed to meet his burden of proving otherwise.

For all the reasons stated above, the Court concludes that the ALJ's decision was lawful and supported by substantial evidence.

## VI. RECOMMENDATION

The Court recommends that plaintiff's motion for summary judgment (ECF No. 10) be **DENIED** and the Commissioner's motion for summary judgment (ECF No. 11) be **GRANTED**.

## VII. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Robert J. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 2, 2019

## Clerk's Mailing Certificate

A copy of the foregoing was provided electronically to counsel for defendant and was mailed this date to:

Wardell Coward, III
410 Whisper Walk
Chesapeake, VA 23322

Fernando Galindo, Clerk

By /s/
    Deputy Clerk

5/2 , 2019
